FILED
98 JAN 23 PM 3: 15
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

PHYLLIS GANT,

    Plaintiff,

vs.

CHARTER COMMUNICATIONS III, L.P.,

    Defendant.

CIVIL ACTION NO.

CV-97-AR-1696-E

Cho

ENTERED
JAN 23 1998

**MEMORANDUM OPINION**

    The court has before it the motion of defendant, Charter Communication III, L.P. ("Charter"), for summary judgment in the above-entitled action. Plaintiff, Phyllis Gant ("Gant"), a female currently employed by Charter, alleges that Charter violated the Age Discrimination in Employment Act of 1967, *as amended*, 29 U.S.C. §§ 621 *et seq.* ("ADEA"), and the Americans with Disabilities Act of 1990, *as amended*, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), by twice demoting her because of her age and disability. In a related claim, Gant alleges that Charter subjected her to a hostile work environment because of her age and disability. For the reasons set out more fully below, the court determines that no genuine issue of material fact exists with respect to any of said claims and that Charter's motion for summary judgment is due to be granted.

24

## I. *Pertinent Undisputed Facts*

Gant began working for Charter in 1985.[1] Gant Dep. at 11. In January, 1989, Gant became the office manager of the company's office in Albertville, Alabama. Id. at 12-13. Charter hired Jack Dixon ("Dixon") to be the general manager of that office in September, 1992. Dixon Aff. at ¶ 1. In this position, Dixon served as Gant's supervisor. Gant was diagnosed with asymptomatic high blood pressure in or around November, 1992. Gant Dep. at 35-36. Shortly thereafter, Gant began to suffer from occasional migraine headaches. Id.

Not long after his arrival, Dixon reassigned Gant to the position of "supervisor" in the data processing department ("data processing").[2] Gant Dep. at 18-20. In or around November, 1995, Charter changed to a new computer system, called Cable Data. Dixon Aff. at ¶ 3. Although Gant received training on the new computer system, she apparently had trouble adjusting to it. Gant Dep. at 69-70. In January, 1996, Dixon informed Gant that his superiors at Charter were not satisfied with her performance.

---

[1] Actually, in 1985, Gant went to work for Mountaineer Cable. In February, 1988, CableSouth bought Mountaineer Cable. In May, 1995, Charter bought CableSouth. Gant has been employed with each successive company. Gant Dep. at 11-12, 20. For ease of reference, the court will refer to this succession of companies simply as "Charter".

[2] Although Gant's job title was "supervisor," she acknowledges in her deposition that she was the only employee in the data processing department. Gant Dep. at 44.

2

Id. at 50, 53-54. Initially, Dixon proposed moving Gant from data processing to a position in the dispatch department ("dispatch"). Id. at 54. However, for some unknown reason, Dixon later changed his mind and informed Gant that she would remain in data processing. Id. at 55, 58-59.

In March, 1996, Charter instituted "pay-per-view" service. Id. at 70. At this time, Gant received additional training to help her adjust to the changes associated with this new service. Dixon Aff. at ¶ 4. At some point during this training, Dixon and his superiors determined that Gant was unable to perform at an acceptable level in data processing. Id. at ¶ 5. Following this determination, Dixon reassigned Gant to dispatch. At this same time, he reassigned another employee, Regina Leeth, from dispatch to Gant's former position in data processing. Id. at ¶ 6. Gant's transfer to dispatch did not result in any decrease in pay. Gant Dep. at 46-47.

In May, 1996, Dixon issued a "counseling and discipline report" to Gant in response to a series of mistakes she made while working in dispatch. Def's Ex. 11 to Gant Dep. As a result of this incident and his perception that Gant was struggling with her duties in dispatch, Dixon reassigned her to a position managing the customer service operation in the company's office in Guntersville, Alabama ("customer service"). Dion Aff.

3

at ¶ 7. Gant did not experience any decrease in pay as a result of this move, and she described the dispatch and customer service positions as being on "about the same level" within the company. Gant Dep. at 131-133. Apparently, a slightly younger employee, Kristi Glitzer, replaced Gant in the dispatch department. Id. at 139.

On September 25, 1996, Gant filed a charge of age and disability discrimination with the Equal Employment Opportunity Commission ("EEOC"). Def's Ex. 13 to Gant Dep. That agency later issued her a right-to-sue letter, and this lawsuit followed.

## II. *Summary Judgment Standard*

Rule 56 states in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Rule 56(c), Fed.R.Civ.P. In addition, the Eleventh Circuit has observed that "[s]ummary judgment is appropriate where there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994). Charter has invoked Rule 56.

4

### III. *Discussion*

As an initial matter, the court wishes to note for the record that Gant failed to file any briefs or supporting materials in opposition to Charter's motion for summary judgment. Notwithstanding this rather significant failure on her part, the court is well aware of its obligation under Rule 56, Fed.R.Civ.P., to consider the evidence that has been submitted in the light most favorable to Gant, and it will do so. The court will address Gant's claims for discriminatory demotion and for hostile work environment in turn.

#### A. Gant's Demotion Claims

Gant alleges that Charter twice demoted her because of her age and disability.[3] According to Gant, the first demotion occurred in March, 1996, when Dixon transferred her from data processing to dispatch. She claims that the second demotion occurred in or around May, 1996, when Dixon transferred her from dispatch to customer service.

The United States Supreme Court first articulated the *prima facie* case for disparate treatment in employment settings in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817

---

[3] The court cannot discern from Gant's pleadings (and she filed no brief) whether she is claiming intersectional discrimination based on some combination of her age **and** disability or an ambiguous, alternative theory of discrimination based on one characteristic or the other. The court will assume that she claims "either or both."

5

(1973). The Court later refined this standard in <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S.Ct. 1089 (1981). Federal courts use this standard where, as here, a plaintiff's claim of disparate treatment relies on circumstantial evidence. Over the years, the <u>McDonnell Douglas</u>-<u>Burdine</u> model has been adapted to analyze varying types of employment discrimination claims, including those arising under the ADEA. For example, in order to make out a *prima facie* case for an ADEA violation, an employee must demonstrate: (1) that she is over the age of forty; (2) that she was qualified for her position; (3) that she experienced an adverse employment action — e.g., a demotion; and (4) that she was replaced by a person who is substantially younger than herself. <u>Benson v. Tocco, Inc.</u>, 113 F.3d 1203, 1208-09 (11th Cir. 1997). If Gant establishes a *prima facie* case for age discrimination, then the burden of production shifts to Charter to establish evidence of a legitimate, nondiscriminatory reason that explains why it took the employment action that it did. *See* <u>Wisdom v. M.A. Hanna Co.</u>, 978 F. Supp. 1471, 1476 (N.D.Ga. 1997) (explaining employer's burden). Finally, if Charter meets this exceedingly light burden, then the burden shifts to Gant to show that the reason given by Charter is, in fact, a pretext for age discrimination. *See* <u>id.</u> (explaining employee's burden once employer rebuts *prima facie*

6

case).

In contrast, in order to establish a *prima facie* case for an ADA violation, an employee must show: (1) that she has a disability as defined by the statute; (2) that, with or without reasonable accommodation, she can perform the essential functions of the job in question; and (3) that she experienced unlawful discrimination as a result of her disability. Terrell v. USAir, 1998 WL 2372 at *2 (11th Cir.); Gordon v. E.L. Hamm & Assocs., Inc., 100 F.3d 907, 910 (11th Cir. 1996). The ADA defines disability to mean either: (1) a physical or mental impairment that substantially limits one or more major life activities, such as working; (2) a record of such impairment; or (3) being regarded as having such impairment. 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(i). Gant attempts to fall within the ambit of the ADA by relying on the third definition, and she alleges that she is disabled because Dixon regarded her as such due to her migraine headaches and high blood pressure. Gant Dep. at 37.

Charter argues that Gant's demotion claims fail under both statutes because she cannot make out the respective *prima facie* cases. This argument is well taken for two reasons.

First, in order to qualify as one is regarded as having a disability, Gant must show that she is an individual who: (1) has a physical or mental impairment that does not substantially limit

7

major life activities but is treated by her employer as constituting such limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) has no illness or malady defined by the EEOC as a physical or mental impairment but is treated by her employer as a having a substantially limiting impairment. 29 C.F.R. § 1630.2(l). As the Eleventh Circuit has observed, perceived impairments must be "substantially limiting and significant." Gordon, 100 F.3d at 913. "[A] significant impairment is one that is viewed by the employer as generally foreclosing the type of employment involved, not just a narrow range of job tasks." Id.

In the instant case, the record contains virtually no evidence that Dixon regarded Gant as being disabled due to her migraine headaches or high blood pressure. In fact, the evidence suggests just the opposite. Gant testifies in her deposition that Dixon knew her migraine headaches did not affect her ability to do her job because he too suffered from such headaches. Gant Dep. at 38-39. Likewise, she opines that Dixon did not think that her high blood pressure affected her ability to do her job. Id. at 40-41. Dixon confirms these impressions in his affidavit. Dixon Aff. at ¶8. Finally, the evidence reveals that, on at least two occasions in the course of their working relationship,

8

Dixon gave Gant increasing, not decreasing, amounts of responsibility. For example, when Dixon transferred Gant to data processing, she continued to perform her duties as office manager. Gant Dep. at 23. Likewise, when Dixon transferred Gant from dispatch to customer service, he effectively placed her in charge of running the company's office in Guntersville, Alabama. Id. at 133-34. Gant concedes that this transfer illustrated Dixon's confidence in her ability to perform her duties responsibly and without supervision. Id.

In light of this evidence, it would be impossible for a reasonable fact-finder to conclude that Dixon regarded Gant as being disabled as defined above. Therefore, the court concludes that Gant has failed to demonstrate that she is disabled within the meaning of the ADA and, thus, to satisfy the *prima facie* case on her demotion claims brought under that statute.[4] The fact that Dixon occasionally asked Gant about her medications, occasionally commented on the physical condition and medications of other employees, or once told Gant that her health seemed improved does nothing to undermine this conclusion.

Second, there is no evidence that either of Gant's transfers

---

[4] Gant does not make any allegation that either her migraine headaches or high blood pressure, standing alone, qualify as disabilities under the ADA. In fact, she disavows any such allegation. Gant Dep. 29-30, 37.

9

constituted an adverse employment action, namely, a demotion. "[A] reassignment is not a demotion unless the employee can show that [she] receives less pay, has less responsibility, or is required to utilize a lesser degree of skill than [her] previous assignment. Hooks v. Diamond Crystal Specialty Foods, Inc., 997 F.2d 793, 799 (10th Cir. 1993) (citing Singleton v. Jackson Mun. Separate School Dist., 419 F.2d 1211, 1218 (5th Cir. 1969)), overruled on other grounds, Buchanan v. Sherrill, 51 F.3d 227, 229 (10th Cir. 1995).[5] In her deposition, Gant admits that neither transfer resulted in a loss in pay. Gant Dep. at 41, 131. Nor is there is any evidence that, as a result of the transfers, Gant was given less responsibility or was required to utilize less skill than before. In fact, Gant's only stated basis for her belief that the transfer to dispatch represented a demotion it that she has a personal preference for working in data processing. Id. at 47. Furthermore, as noted above, it is clear that at least one of the challenged transfers — from dispatch to customer service — represented an increase in responsibility. Finally, in her deposition, Gant describes the dispatch and customer service operations positions as being on "about the same level" within the company. Id. at 132-33. It is

---

[5] The Eleventh Circuit adopted as precedent all Fifth Circuit opinions filed as of the close of business on September 30, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

10

well settled that a lateral transfer does not rise to the level of an adverse employment action. <u>Williams v. Bristol-Meyers Squibb Co.</u>, 85 F.3d 270, 274 (7th Cir. 1996). Accordingly, the court concludes that Gant's transfers do not constitute materially adverse employment actions sufficient to satisfy the second element of her *prima facie* case under the ADEA.

Inasmuch as Gant is unable to make out her *prima facie* case under either the ADEA or the ADA, summary judgment is appropriate on her demotion claims brought pursuant to those statutes.

### B. Gant's Hostile Environment Claims.

Gant also alleges that Dixon subjected her to a "campaign of harassment," apparently on the basis of her age and disability, although nothing in her complaint confirms that these are the reasons for the alleged harassment. Complt. at ¶ 12. As an initial matter, the court notes that the Eleventh Circuit has not expressly held that the hostile work environment cause of action, more commonly employed in Title VII litigation, is available under either the ADEA or the ADA. However, that court has allowed hostile environment claims to proceed under the ADEA where the employer did not assert that such claims are unavailable under that statute. *See* <u>U.S. E.E.O.C. v. Massey Yardley Chrysler Plymouth</u>, 117 F.3d 1244, 1249 n.7 (11th Cir. 1997) (acknowledging that Sixth Circuit recognizes existence of

11

hostile environment claims under ADEA). Likewise, at least one federal court of appeals has been willing to assume the existence of the hostile work environment cause of action under the ADA. *See* McConathy v. Dr. Pepper/Seven Up Corp., 1998 WL 229 at *4-5 (5th Cir.). Because Charter does not question whether a hostile work environment is actionable under the ADEA or ADA in the Eleventh Circuit, the court will assume, without expressly deciding the matter, that such claims exist for purposes of this opinion. In keeping with other courts, this court will use the framework developed for analyzing such claims under Title VII to evaluate such claims brought pursuant to the ADA and ADEA. *Cf.* id. (using Title VII model to analyze hostile work environment claim brought under ADA).

The Eleventh Circuit has explained that a hostile work environment is actionable "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the condition of the victim's employment." Fleming v. Boeing Co., 120 F.3d 242, 245 (11th Cir. 1997) (internal quotations omitted). To succeed on such a claim, a plaintiff must show that the employer's conduct created an "***objectively*** abusive and hostile atmosphere." Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995) (emphasis supplied). Courts determine the existence of a hostile

work environment by examining the totality of the circumstances. Dudley v. Wal-Mart Stores, Inc., 931 F. Supp. 773, 791 (M.D.Ala. 1996). The factors used in conducting this examination include: (1) the frequency of the discriminatory conduct; (2) the severity of the discriminatory conduct; (3) whether the conduct was physically threatening or humiliating, or merely offensive; and (4) whether the conduct unreasonably interfered with the employee's work performance. Edwards, 49 F.3d at 1521-22 (citing Harris v. Forklift Sys., Inc., 114 S.Ct. 367, 372 (1993)).

In her deposition, Gant recounts a number of incidents that she claims constituted hostile environment harassment. She claims that Dixon said, "God damn it, Phyllis," to her on "several" occasions. Gant Dep. at 152. She also claims that Dixon made derogatory comments or jokes about other employees. For example, she says that Dixon once joked that a coworker, Glenda Wilson, had Alzheimer's disease. Id. at 144. Finally, Gant claims that Dixon harassed her by "[h]is tone of voice" and "[h]is attitude toward [her]." Id. at 143-44. The court will consider all of these incidents in examining the "totality of the circumstances" at Charter.

Using the factors set out above, it is clear that the totality of circumstances at Charter do not make out a claim for hostile work environment harassment for several reasons. First,

13

there has been showing as to how any of the incidents or behavior described above interfered, either **unreasonably** or otherwise, with Gant's work performance.  Second, the record reveals that incidents of alleged age or disability harassment at Charter were sporadic at best.  For example, in her deposition, Gant later admits that, during the four years that she worked with Dixon, he used profanity with her only "two or three times."  Id. at 152. Finally, with respect to Dixon's tone of voice, his attitude, and his use of profanity with Gant, the record is devoid of any **objective** indication that his conduct was motivated by some age- or disability-based animus.  It is axiomatic that absent any evidence of such animus, Gant may not rely on these incidents in bringing her hostile environment claim.  Therefore, the court concludes that Gant has failed to demonstrate that any alleged age- or disability-based harassment at Charter was sufficiently severe and pervasive to create a hostile work environment. Accordingly, Charter is due to receive summary judgment on Gant's hostile work environment claims.  See Crawford, 96 F.3d at 836 (affirming summary judgment for employer where employee failed to show that employer subjected her to alleged harassment because of her age, that alleged harassment unreasonably interfered with her work performance, or that objectively hostile environment existed).  In enacting the ADEA and ADA, Congress did not intend

or expect the federal judiciary to monitor all offensive language in the workplace.

### IV. *Conclusion*

The court will enter a separate and appropriate order in accordance with this memorandum opinion.

DONE this 23rd day of January, 1998.

                            WILLIAM M. ACKER, JR.
                            UNITED STATES DISTRICT JUDGE